We're going to hear argument next in 182707, Sacerdote v. New York University, Mr. Schlichter. You there? Is Mr. Schlichter there? Yes. Thank you, your honors. Can you hear me? Yes. Yes. Jerome Schlichter, trial counsel in the case. From beginning to the end, this has been a litany of highly unorthodox rulings by the court. And this court, your court, has already reversed the judge in an opinion by you, Judge Walker, in a related case that we had to file to protect the class because we were not allowed to amend. And that was even dismissed before we had a chance to hear from the defendant filing a motion to dismiss. Judge Calabresi in that case said it First, the retail share class claim. Was that the Kamek case? I think that was the Kamek case. Yes. Yes, your honors. Yeah, okay. Yeah, right. The court dismissed the complaint here that cited 63 retail mutual funds that are double or triple the cost of the same identical institutional funds except for fees and readily available in this $5 billion pool of assets that they had. It did so on a ground not even raised by the defendant. And then on reconsideration, the court admitted she wrongly decided that but then dismissed again under a new standard not even ever adopted before by any court of appeals that imprudent investments must be so prevalent that the entire plan is tainted. Again, this wasn't even argued by the defendant. And she didn't discuss how many prudent funds were needed if 63 were not sufficient. The unanimous Supreme Court in the landmark case of Sybil Vieticin, which we handled, implicitly recognized the validity of this claim because that was also a billion-dollar-plus plan with retail mutual funds. And the decision of the court dismissing this directly conflicts with both the Third and Eighth Circuits as well as this St. Vincent decision. I mean, in that case, in the Cribble case, I mean, isn't there the question about the failure to investigate the option of an institutional fee as opposed to a retail fee and that the plan sponsored because they failed to investigate breach to fiduciary duty? But here, wasn't it a conscious decision to offer certain retail shares because it was part of the revenue sharing agreement to pay for the recordkeeping? Doesn't that make it different? It's not a failure to investigate. Well, the allegations were, and that was our case, as I said, Your Honor, the allegations in Sybil were virtually identical on the retail share class claims. No, the basis for the Supreme Court's decision in Sybil was that they accepted that it would be imprudent for that they investigate. But in that case, the Ninth Circuit had upheld dismissal of the claim because the retail mutual funds had been in the plan more than six years. And the court said that it was a statute of limitations had run, but the Supreme Court unanimously said, no, that's not the case. The statute did not run because there's an ongoing duty to monitor funds for prudence and fees. I understand, but isn't the Ninth Circuit saying the breach of the fiduciary duty was the failure to investigate the availability of the lower fee, the lower institutional fees as opposed to the retail fees? Yeah, that is part of the ruling. Right, and so in our case, isn't it the offer a number of them, but they have decided in order to implement revenue sharing to offer some shares at the retail rate. Does that make it different? Maybe you can explain to me why it's not different, but it seems to me that's a distinction. There isn't a deficiency in the process the way you might think there was in Sybil. Well, when there are 63 funds that are retail, it raises an inference of failure to investigate and it was dismissed. This was before trial, obviously. At the trial, no one said that they had investigated the retail fund and compared them to institutional rates and decided to have retail because of the revenue sharing embedded in those and certainly... Go ahead. I'm sorry. You're making the point that on the pleadings, that inquiry would be appropriate after you get past 12B6. Absolutely. Yeah. You can't assume at the complaint where the allegations are taken in the light most they did an investigation, which it turns out they didn't do at the trial. Let me just do this. Suppose you just pled one claim with respect to one of the investments that they should have used the wholesale or the investment rate rather than the retail. Would that state a claim or is it part of the fact that if that in the context of the overall offering is important? I mean, here you're saying a huge number were provided at the retail rate without an investment rate option, but if it was just one, would that be sufficient to state a claim? If it were plausible, you were just mentioning in the last case, the Iqbal case, if it were plausible under Iqbal that that raised an inference of failure to investigate, yes, the Seventh Circuit and other circuits had held that each fund must be prudent in a plan. Otherwise, you could have a Bernie Madoff fund in a plan and have others that are perfectly prudent and say no harm because somehow the Bernie Madoff fund is credited against the positive, prudent funds. But you're saying it relies on a failure to investigate, right? So if in fact the sponsor had investigated and made a conscious choice to offer a certain number of retail funds, would that still be a violation of fiduciary duties or it's not because the to investigate? The breach would be the failure to investigate, Your Honor, and the issue would be then a factual issue if those retail mutual funds, after use of the revenue sharing to pay record-keeping fees, made them reasonably priced. That would be a factual determination. But here there were 63... But is it disputed here that the 63 retail fees, that the reason why NYU is offering them is because of the revenue sharing? There was never any evidence, Your Honor, that that's why they did it. They didn't investigate them and compare them to what the institutional rates would have yielded. There never was that. So was there a dispute about whether they did that or not? They didn't do it and they can't contend that they did. There was nothing in the evidence that suggested they did. But again, we're at the dismissal stage. We're at the pleading stage here. And to say that there could not be a cause of action for fiduciary breach when you have a five billion dollar plan with retail funds, 63 of them embedded, where there's an identical 63 institutional funds at a fourth or third of a cost and there is no allegation that this is a breach, that's a breach. But there's no evidence that they did it. And so, the court, in adopting this unannounced standard anywhere else, that they must so taint the plan that... Or be so prevalent as to take the entire plan. The court didn't say, if 63 isn't enough, how many does it take to taint the plan, if that even were the standard. So moving to the trial conduct itself, your honors... Can I just... I have a further question. Maybe your answer to this will be that this is something to be determined at trial. But if in fact, the sponsor decides to offer some retail funds in order to do revenue sharing, if in fact, they pay for all of the record keeping services they get by only offering two funds at the retail price in a full menu of options, including 300 different options, we would have to say that there's no breach of fiduciary duty there because that seems like a good deal since no one is required to even purchase those two funds and it's a very small relative to the overall mix of options. Wouldn't we say that that's not a breach? And so then, how do we know... When is there a breach? Are we making a judgment as to the degree of revenue sharing that's appropriate, as opposed to some defect in the process of arriving at the offering? We're not saying, your honors, that there couldn't be retail mutual funds in a plan. If there were investigation and that resulted in reasonable fees for record keeping and for investment management. But that's a fact that must be investigated. And each fund must stand on its own, your honor. It is not sufficient to say that you have 99 funds that are prudent if one is imprudently expensive. The analysis must be done as to each fund. There's no balancing or tipping the scales where a certain number are proper and a certain number aren't proper. It's just not that way. So, the pleading stage, again, is the basis for... But then, aren't you saying that the investigation has to be... They can offer retail funds in order to accomplish the revenue sharing, but they need to investigate each one in order to make sure they're not paying any more than necessary to get the record keeping? That's correct. Yes, they have to analyze the funds. And you can't take one alone because in no plan of this size, for 25,000 people, can one fund begin to pay for the record keeping? So, the record keeping cost that is its own area of fund, of cost, that has to be reasonable. And the way you look at that is you look at all of the revenue sharing. If you have retail funds, I mean, you don't have to have retail funds. You can simply put out the bid record keeping. But if you do... No, I understand. But in this hypothetical, you have the retail funds. But aren't you sort of saying that it's a breach of fiduciary duty if they don't get the best possible deal for the record keeping, but if they're paying a little more than they might be able to achieve with tougher negotiating tactics, that's a breach of fiduciary duty? We are not saying that, Your Honor. We are not saying they have to get the best possible deal. We have never said that. The defendants have suggested it, but we have never said that. So, why is what you just said about each investigate each fee to make sure that you're not paying too much for the record keeping? Why is that different than getting the best possible deal? Because you don't need the best possible deal. The fee must be reasonable. But each fee, each fund and each fee has to be analyzed in that context. Is it not necessarily the best by any means, but is it reasonable? Is it excessive or is it reasonable? That's the analysis, whether you look at one or the other. You're saying a little more than that, I thought. I thought you were saying that you may end up with a conclusion after the trial and looking at everything that it's reasonable. But still, there has to be a process to go through to get there. And there has to be an investigation. And you can't just say it's reasonable in the abstract if there's no investigation. Is that what you're saying? Absolutely, Your Honor. ERISA is about process. That is the essence of ERISA. And that's the essence of the requirement for investigating that process. So, the trial conduct, I want to speak to what happened here. This was extraordinary. The court obliterated Rule 43A by substituting narrative written statements in lieu of client testimony. And the reason that's important, Your Honors, is that all the fact witnesses, eight of them, about the process, which is the essence of the case, were affiliated with NYU. Plaintiffs don't know what process they went through in looking at this plan. The court then allowed unlimited pages of lawyer-drafted written declarations, 177 pages. Counselor, they were subject to cross-examination. You get the affidavits in advance. You can prepare your cross. It's just as though that were the direct testimony. And then you cross-examine. You can explore every issue that way. Right? The appeant is on the sand. It just saves time for the trial court to say, look, I'll take the affidavits as a starter. That's the starting point. And we're going to even, we're not going to have the proponent of the witness bother to question the person. I'm not going to waste my time with that. And then put it in an affidavit. And then let the other side have at it on cross. So, the issues can be explored. Let's look at what happened here, Your Honor. First of all, they controlled all of the fact witnesses. So, this was an unrebutted 177 pages of lawyer-drafted narratives. It wasn't a question and answer format. And there were no guardrails for relevance or materiality or the usual guardrails. The court then, it was a book, 177 page book with eight chapters written by lawyers and all of it hearsay. The court then read the book before the trial, before even opening statements by the plaintiffs. So, it would be like in a jury trial, giving a jury a book written by one side, asking them to read it before the trial and then say, now go cross-examine those people. And speaking of objections, Your Honors, we submitted detailed objections to many, many parts of this narrative. But the court never ruled on any of them. The court took these narratives and they had hearsay on hearsay, there were conclusions, there were immaterial statements, and then the court compounded that by severely truncating the time for oral examination of the witnesses, despite having unlimited pages for their written material. Okay, Mr. Schlichter, I know that we've gone over time, but I think we get this point. Is there some other point you want to make? And then we'll hear you again on rebuttal. Yeah, Your Honor. The 28 U.S.C. Section 455A says that the court shall disqualify herself if her impartiality might be questioned. Once she decided that she was leaving the federal bench while this case was under advisement, she was required to do that, Your Honors. She said that when she thereafter announced she's going to the Cravath firm, she said she was, quote, thrilled to be, quote, coming home and had never, importantly, never considered going anywhere else. So she was hoping to return to the firm. But Cravath wasn't involved in this case. It's not as though she was going to join one of the lawyers for this case. Right. Or anything of that sort. He was a member of a 60-man board, Chesler, of NYU. And so it's much more attenuated than the usual case that you're talking about. Well, it's true that Cravath was not on the case, Your Honor. That's correct. But their chairman, he was on the executive committee of the Board of Trustees of NYU. But how much testimony was there about the executive committee? I thought it was the actual committee that ran the funds that were really involved. And that's what the case was all about. It wasn't the executive committee. It wasn't the board as a whole. This was just something that was going on there, of which he had no involvement in this case, as far as you know. There's no evidence that he was reviewing anything to do with this case, I think, other than the fact that the board is responsible for everything that goes on in the world of the university. But beyond that, in terms of direct involvement, none. Well, with respect, Your Honor, the board had responsibilities for the plan and monitoring the actions of these fiduciaries whose conduct was the issue in the trial and removing them, which is one of the things we asked for, for two of them, removing them if they weren't carrying out their duties. Well, that's another question that you haven't addressed. That's another question that you haven't addressed that really concerns me a little bit. And that is that the two people closest to managing the fund who were on the committee, the two women, she did not remove them. But in effect, you wanted to amend the complaint to add them as defendants specifically, correct? And she didn't let you do that. She did not let us do that. That's why we had to do that. But even if you cast all that aside, Your Honor, all the relationships on the board of trustees, Mr. Chester said he owes his career to NYU because they gave him a scholarship. He was also her mentor. He worked closely with him for 20 years and he appeared in support of her at her Senate confirmation hearing. So under these circumstances, again, actual bias is not necessary. What's involved is the appearance of whether or not she could be impartial under these facts. So what she's being done, she's considering whether to enter a substantial judgment against NYU, which institution is like passion of the man who must approve her coming to the only firm she wants to work for. And to do that while he's head also of their fundraising, a $1 billion endowment campaign and her mentor. And where that... I think we have the argument, Mr. Schlichter, you reserve some time for rebuttal. So we will hear from you again. But let's turn to the appellee, Mr. Waxman. Good morning and may it please the court. Can everybody hear me? Yes. Good. So my friend on the other side has raised four of the several issues that on which they've appealed. One is the dismissal of the share class theory. The second was the fourth had to do with Judge Torres's denial of the Rule 60B motion, one on recusal and one with respect to the failure to add Ms. Sanchez and Ms. Marr. And I'll try to take them in order. As to the dismissal, I think it's very, very important to understand what went to trial in this case and what didn't. The issue in this appeal are counts two and three of the amended, second amended complaint, both of which were subject, the subject of an eight-day trial after which the trial court found no fiduciary breach and also no loss. Now the plaintiff in this case alleged multiple theories in support of both count three and count five, and those are outlined in the trial judge's opinion at Special Appendix 97 and 102. One of the multiple theories alleged in support of count five was that it is always imprudent to offer retail class shares when less expensive institutional shares are available. That theory was dismissed. And the dismissal, let me start with the appeal of that dismissal, which fails for two reasons. One, the dismissal was correct as a matter of law. And second, because even if it wasn't, it would have been utterly harmless in light of the trial that was held and the findings that were made. As to dismissal, the dismissal was correct. And I'll, I want to make sure I address Judge Manasci, your questions about Tybil. But dismissal was correct because the complaint itself showed why, as the district court put it, quote, inclusion of retail options despite the alleged availability of identical institutional shares does not on its own suggest imprudence. That's at pages Special Appendix 120 and 105 and 106. The complaint itself in this case, and I'm pointing the court to paragraph 51 of the amended complaint, allege that the difference in fees between retail and institutional share classes is often attributable to the revenue sharing used to pay the record keeping fees, but that those record keeping fees will be charged separately when the institutional shares are offered. And therefore, referring, Your Honor, to the Tybil decision, and I'm quoting from page 1118 of 729F3rd. This is Judge O'Scanlan's opinion. He says, remaining for trial after the pretrial dismissal was beneficiaries claim that the inclusion of retail class mutual funds had been imprudent. Without retreating from an earlier decision at summary judgment that retail mutual funds were not categorically imprudent, the court agreed with beneficiaries that Edison had been imprudent in failing to investigate the possibility of certain institutional class alternatives. And that's exactly what happened in this case. The judge dismissed what Mr. Schlichter at page 745 of the transcript himself termed, quote, the generic share class issue, but went to trial on the as applied version of that theory, what Mr. Schlichter called at the same page, the specific share class issue. And following this full trial, and I'll address in a minute, the Judge Walker's point about whether the trial did or didn't show that there was a process to consider the two different classes of shares. The trial court found first, that NYU's revenue sharing arrangement was not imprudent, and that it was the reason why NYU offered retail shares, that is to pay the revenue, record-keeping fees through revenue sharing. And the court also found that the plaintiffs had failed to prove that the record-keeping fees paid as to this plan were excessive or caused any loss. There is not a word in the plaintiff's brief in this case challenging either of those findings of the trial. You have to tie that now into the share class question. That's right. And the question that 63 shares, the retails were used, and how that plays into the revenue sharing aspect of it. But that was never an opportunity, because those counts were dismissed, to focus on that precise question, right? With respect, Judge Walker- General analysis of prudence in the revenue sharing aspect of it. No, no, no, Judge Walker, let's be very clear about this. First of all, there were no counts dismissed. She did not allow them to pursue a per se imprudence theory as to the offering of She allowed them to go to trial on both count three and count five. You can look at her, I mean, look just at paragraph 208 of the amended complaint, which is count five, which went to trial. It was that the quote, the defendants failed to monitor the amount of revenue sharing received by the plans record keepers, determine if those amounts were competitive or reasonable for the services provided, or use the plan size to reduce fees and obtain rebates. At page 30 of the special appendix, she specifically identifies the claim that went to trial, that there was a breach because quote, use of untapped revenue sharing to pay record keeping fees led to overly high payments. Now, the argument by my friend, the assertion by my friend on the other side, that there was no evidence that the committee ever, to use his words, used a process to determine not to use institutional shares is fantastical in light of the testimony in this case and the trial judge's careful findings. I would direct the court just to defense exhibit. Are you saying that there were precise findings as to each 63 retail share funds, retail share cost funds, that those funds were necessary in order to effectuate revenue sharing and that that was investigated? So there was no testimony in this case offered by the plaintiffs or anybody else as to each of the 63 funds. What went to trial on the revenue sharing claim, Judge Walker, was an allegation that the defendant was imprudent in using revenue sharing to pay excessive record keeping fees via the retail shares. The trial judge discussed those claims and the evidence in the case at pages 29 and 30 and 52 to 56 of the special appendix, and the plaintiffs don't challenge her findings of fact that it was not imprudent and that even taking all of the record keeping fees paid as a whole, there was in fact no loss. She, I'll point the court to page – Well, you're saying that despite the dismissal of what you're calling the generic share class theory, there was essentially a trial on the share class claim because she evaluated whether the amount of record keeping that was paid for through the she specifically found, and I direct the court to page 55 of the special appendix and notes 72 and 73, that the per participant fees charged on institutional shares was often more expensive than the fees that were included in the revenue shares. And on page 56 and 57 of the special appendix, and particularly footnote 76, she found that, quote, a proper analysis does not establish that either plan paid excessive record keeping fees. And the notion that there was, by my friend, that there was no evidence about this or that the committee never considered this is fantastical. I will direct the court's attention just to take one piece of evidence. When is that? At 560 – I'm sorry, may I just give you the site? I think Judge Walker – does Winter have the question? Oh, I'm sorry. I would like to give you the site, but let me take the question first. I think it was me, Judge Walker. Oh, sorry, go ahead. The only question I have is, wouldn't that be consistent with a finding that the retail fees would have been appropriate in 40 cases, but not the other 23? I mean, that's a generic finding about the use of revenue sharing, and that's an appropriate way to take your fees, to pay for the costs. But that doesn't encompass the claims that are involved, or the particular aspects of the claim that's involved in the share class claims that were dismissed. So there were no claims dismissed in this case. There was one theory alleged in support of count five, that is the per se imprudence theory, that she properly rejected as the Seventh Circuit properly rejected. Are you saying that that was just a finding as a matter of law that could never be – so it's automatically improper to ever plead that is just a matter of law? So, no, no, no, no. I mean, I want to be very clear about this. Our contention is that it was correctly dismissed in this case because their complaint pleaded themselves out of that claim. In paragraph 51 of the complaint, they explained exactly why it is that retail shares are more expensive than institutional shares, which is the record keeping that is paid through revenue sharing. And they also acknowledge that record keeping fees, when institutional shares are purchased, record keeping fees are separately assessed. So is your position that if the plaintiffs had not alleged that they didn't have paragraph 51, and they didn't tie the retail fees to the record keeping revenue sharing, that they could state a claim just by saying there are some retail shares in this mix of options, and there could have been institutional shares for lower fees, and that's a violation of fiduciary duty. So that would normally be the claim. But you're saying it was dismissed here only because of paragraph 51. I'm sorry. I think we think paragraph 51 makes it particularly clear. I think it's clear, even from their opening brief at page 32 in this court, and their reply brief at page 30, that the dismissal of what Mr. Schlichter referred to as the generic share class theory, as opposed to the specific share class claim that was fully tried, was appropriate. I mean, I think in both the Devane case in the Seventh Circuit, and certainly in Tybalt, by virtue of the language I just read you, the courts in those cases, without pointing to some special allegation in a complaint, simply said that what the Ninth Circuit referred to as, quote, the broadside against retail class mutual funds was properly dismissed, but the more targeted challenge against the use of retail shares in the funds that were in fact invested in the plan properly went to trial. Here that was done, and the court found as fact that the fees paid, even accounting for all of these 63 different types of funds, were not excessive, and it was not imprudent to do it. And one of the reasons that the court found that, it can be found on, just to take one of many, on page two of Defense Exhibit 565, which is the retirement committee's meeting minutes in January 2001, in which after a long discussion, comprises almost all of this page, single space page, of the difference between lower share, lower cost shares and higher cost shares, the minutes reflect the following, quote, the committee agreed that since a change in share classes would not result in an actual fee reduction for plan participants, it did not make sense to change share classes at this time. And there was plenty of other testimony in the case to that effect. I mean, that's why the court found, as fact, that there was no imprudence in using retail shares to pay the record-keeping fees through revenue sharing. And I- This is the generic share class theory or claim, whatever it is, when she dismisses it, doesn't it rely on a different conclusion, which is that as long as the overall mix is not unreasonable, you can't state a share class claim. Yes, and we are not defending the reasoning that she gave, either in the original dismissal or in her denial of the reconsideration motion, except to the extent that in both cases, she found that the- I'm sorry, I'm forgetting the quotation. She found, oh here it is, on pages 105 and 106 and 120 of the special appendix, that quote, inclusion of retail options despite the alleged availability of institutional class shares does not on its own suggest imprudence. So I suppose you could say that we- I think that that was also a reason why she dismissed it, but if it isn't, we're offering it as an alternative grounds for affirmance. And of course, our other ground for affirmance is that it would be entirely futile to now, even if she were- even if she erred in dismissing this theory, it would be entirely futile to remand this for trial, because there is simply no way that the district court could have held as it did on the revenue sharing claims, but rule for the plaintiffs on the share class claims. I've given you the court's findings on this, both of which would be necessary in order for them to get any relief on this per If I may, I realize I've used a lot of time, but if I can just address the other three points that my friend raised or this court raised. Let's try to do them quickly. Yes, I'll do it extraordinarily quickly. First of all, this complaint about the use of declarations on written direct, first of all, it was approved by this court in ball versus inter-oceanic. It's, this court knows, it's commonplace in the Southern District of New York. And in any event, this was utterly waived. There was never an objection to the use of written direct prior to this appeal. Now in their brief and their reply brief at page 24, they cite special appendix, page 131, to contend that they did object. You can look at that page as long as you want, and you will see that they never ever objected. So that claim, although meritless, is also waived. As to the 455 claim, the issue in this case is whether Judge Torres abused her discretion in denying the Rule 60B claim. And that, her determination itself, was an evaluation of whether Judge Forrest abused her discretion by not sua sponte recusing. And so the level of deference to the trial court's finding in this case is extraordinary. Now they say that this was entirely inappropriate because, although Cravath wasn't involved, you know, Evan Chesler was a good friend of hers, and they have what Judge Torres referred to as an extraordinarily attenuated circumstance. I think I'll simply say that they have not cited a case, and I am aware of no case, in which a court even reversed a denial of recusal, much less the denial of a Rule 60B motion, on facts remotely like this, where the alleged relationship was neither with any party in the case, or with any lawyer for any party in the case. And finally, with respect to, and Judge Walker, I know you were concerned about this, the failure to remove, well, their Rule 60B motion challenging the failure to remove Ms. Marr and Ms. Sanchez. Which ties into, that also ties into the denial of an amendment, allowing them to amend the complaint to include it. Yes, exactly right. And so the issue in the motion to file a second amended complaint, I have three points to make about this. First of all, because this followed the court's Rule 16 pretrial order, the standard is good cause. They're not even arguing that they meet the good cause standard. Their argument is that they meet Rule 15A standard. But this court's decision in Parker, I think is dispositive. And the notion that because what Judge Forrest said is, you know, after two weeks after this pretrial order, you know, no amendments without leave of court, that is entirely consistent with the Rule 16 standard. I mean, Rule 16 allows you to make such motions following the period explicated in Rule 16, provided that you show good cause, that is the court can provide leave of court. In this case, number one, the leave of court, the good cause standard, both turn, as this court has said over and over again, on whether or not there was, in fact, no failure of diligence. In this case, the reason why the filing was not allowed, Judge Forrest basically said is, you have known for 10 months who the members of this committee were. We are now a few weeks away from the close of all discovery, and you have therefore not shown diligence, and it would upset the discovery and trial schedule, in this case, to now add all of these people. I think it's... Okay, I think we have the argument on this question. Thank you very much, counsel. You want to say a final word? I just wanted to say that the plaintiffs in this case never sought removal of Ms. Marr and Ms. Sanchez until the post-trial motion in front of the judge. They had an ad in their... Yes, thank you. I'm sorry. Thank you very much, counsel. We're going to turn to Mr. Schlichter on rebuttal. Mr. Schlichter. Yes, just as to that last point, wrong. We, in our complaint, asked for the removal of the fiduciaries who didn't do their jobs. We specifically asked for that. Insofar as the objections, the use of... In the trial conduct, the use of written declarations, we understand it's been done a lot in the Southern District. And the Ball case, in that case, the difference with that and us is that in the Ball case, the other side agreed to use written declarations. We did not agree to that. And we specifically said that this is different from, say, an auto accident case, your honors, or you got two witnesses who see it and two testify for one side, three testify for the other. Here, what's different is every single witness on the fact is in the control of NYU because the plaintiffs don't know what that process was. So when you combine that, the use of it in this case, even if it's proper in some cases, it's not proper here because you've got 177 pages of narrative and the court read those pages before even hearing opening statements from the plaintiffs. So it's a very different situation. Mr. Schlichter, I thought your adversary was making a point, though, that you went along with this process and didn't object. And now you want to, after seeing the result of the case, want to go back and raise this issue. Well, no, your honor, we did object, and he is wrong on that. He referred to our reply brief quoting the letter that we had sent and orally what we said. I said it, I remember it to this day. I said it multiple times. This is unfair, judge, because NYU controls the fact witnesses. We don't believe that that is a fair use of this abdication of Rule 43A in this situation under these facts. We ask for more time for oral examination. We ask that this not be done. We made a very strong record, and it is a fact that I've never, I've been trying cases for 40 years, over 40 years. I've never seen a case like this where this has happened. And I was adamant in saying this and personally remember this multiple times to the court. And we cited that in our reply brief. So we didn't go along with this because it's so fundamentally unfair. And those narratives, your honor. Okay, I think we have the argument on that point. Can I just ask you to respond to this idea? So in your opening argument, you had said to me that there the number of retail funds that were offered was amounted to reasonable payment for the record keeping. And so opposing counsel has just said that you actually got a trial on this question of whether there was a reasonable payment for the record keeping. And so there's no way you could prevail on a share class claim. What do you have to say about that? Start with the fact that your two components of the expense ratio on every mutual fund. There's a portion which is administrative fees, aka record keeping and investment management fees. Those two combined to make up the expense ratio, the fees and the difference between retail and institutional funds. We were handcuffed by not being able to speak about that in the trial because those cases, we're off limits. He's spoken only about one part of that, the record keeping piece of that. He hasn't mentioned a word about the investment management fees, which made up part of the excessive fees that these retail mutual funds charge. And apart from that, we're not always imprudent. We never have said it's per se imprudent to have retail funds in a plan. It raises an inference plausibly due to failure to investigate, which we did allege. And that's a distinct breach of duty. But there isn't a failure to investigate if in fact it's a conscious choice that NYU makes, right? And so it sounds like what you're saying is that you got a trial on the question of whether it's reasonable for the record keeping portion of the fees, but you should have been able to proceed on a theory that it was unreasonable payment for investment management fees. Is that right? The latter, your honor, yes. We should have been able to have that. And that's because when you're a large institution like NYU and you have a large magnitude, you expect management fees to be reduced through the economies of scale. And therefore, they should be lower for the investment side than the retail side. And that issue was never explored. Is that what you're saying? Well, the full is. Basically, the management work is the same, except it's much more efficient, the greater the size of the fund. And therefore, the fees should be lower under those circumstances. And that's the normal reason why you would go with investment fees, because you are dealing with a large fund and you shouldn't have to pay retail fees under those circumstances. That's the advantage of investing your money this way rather than in a smaller fund. Is that what you're saying? That's correct, your honor. And the Department of Labor on its website says that retail fees funds are four times more expensive than the institutional equivalents that are identical in every respect except for fees and readily available. You're saying is that that differential can't be accounted for just by revenue sharing because there's a management fee component to that. And that was what you were not allowed to go into. Well, that's right, your honor. But yes, but we also he also never made a finding that the recordkeeping fees were reasonable. He said we didn't prove that they were unreasonable. He didn't make a finding. So on remand, if the court were to reverse, the whole issue of those fees have to be opened to make that determination. And I will also I just want to say one or one other point, your honor, about recusal. Judge Winter, you said recusal is especially important in a bench trial where because the court is making all the important factual determinations. And also with regard to the. Yeah, I'm familiar with that case, but the circumstances governing recusal in that case, which involved a judge who owned, I don't know, a couple hundred thousand dollars of shares in the bank and was adjudicating a case involving the bank's conduct. It was very different from this case. The facts were quite different, your honor. But the standard is that in a bench case, it's more important than in a jury case. And here, the important thing to also remember is no one denies they never filed an affidavit saying that employment discussions were not going on while this case was under advisement and while she was deciding the case. We know she went overnight from being a sitting federal judge making rulings to the next morning being on the firm website and at the firm. So there was a point where she was discussing her. Thank you, counsel. I think we have I think we have that argument. If there are no more questions, thank you for your argument. And the case is submitted and therefore we are adjourned. Thank you, your honor. Course sense adjourned.